[Civ. No. 9024. Second Appellate District, Division One.—June 14, 1935.]

MARY MEYER, Administratrix, etc., et al., Appellants, v. GRANVILLE WILLIAM JOHNSON et al., Respondents.

James P. Clark and Laird L. Neal for Appellants.

Meserve, Mumper, Hughes & Robertson and E. Avery Crary for Respondents.

ROTH, J., *pro tem.*—This is an action in which appellants, as plaintiffs, seek to recover the proceeds of two several life insurance policies issued April 21, 1926, and delivered April 28, 1926, on the life of Hazel Edna Johnson, deceased, the insured. Plaintiffs are the mother of the deceased, as administratrix of her estate, and the minor son of deceased by a former marriage. Defendant Granville William Johnson, hereinafter referred to as defendant, was the husband of deceased and the beneficiary named in the policies. Within a few days after the policies were issued, deceased, her minor son and defendant started on an automobile trip to Missouri, and while in the state of Arizona, the husband, on May 2, 1926, killed the deceased, and was subsequently tried and convicted of murder. He is now serving a term of life imprisonment. On April 27, 1928, plaintiffs brought the instant action. At the time of the first trial, respondent insurance company (hereinafter referred to as respondent), one of the defendants herein, objected to the introduction of any evidence, on the theory that plaintiffs could state no cause of action. The objection was sustained and judgment subsequently entered against the plaintiffs. This judgment was reversed (*Meyer* v. *Johnson,* 115 Cal. App. 646 [2 Pac. (2d) 456], and the cause sent back for trial, the appellate court holding that since the beneficiary named in the policy murdered the insured, he was disqualified to take, but that the heirs at law of the insured had a right to maintain an action on the policies in question. The status of plaintiffs as heirs at law is conceded. Respondent's defense, suc-

cessfully urged at the second trial, from which this appeal arises, briefly stated, is that the policies were in fact never issued or delivered, inasmuch as defendant made application for the same, without any authorization from his wife, for the sole purpose of perpetrating the crime he subsequently committed, in order to collect the insurance.

An analysis of the evidence discloses that one Starr, soliciting agent for the respondent, commenced to talk insurance with defendant the latter part of February, 1926, first with reference to the life of defendant and later, during the course of the negotiations, according to the testimony of Starr, because of defendant's stomach trouble, it was decided that the life insurance be taken out on the life of deceased. After approximately six weeks of contact between defendant and Starr, two blank applications were handed to defendant, who subsequently returned them to Starr, one completed in pencil in the handwriting of deceased (according to the testimony of defendant), and the other in blank, except for the signature of deceased in ink. The penciled application was either lost or destroyed by Starr, it being definitely established at the trial that it was not available. The application of the deceased signed in ink was completed by Starr from the information contained in the penciled application, and the signature of deceased witnessed by Starr, although he subsequently testified he did not actually see deceased sign, and further that he never saw deceased at all, since he conducted all of his negotiations with defendant. At the trial the father, mother and cousin of deceased, all of whom were properly qualified, testified that the ink signature signed in blank to the application which was filled in by Starr and ultimately filed with respondent was the signature of deceased. The defendant, in a deposition introduced at the trial, testified to the same effect. The only contrary evidence was the testimony of a handwriting expert, who said that the writing was that of defendant and not that of deceased. ▆ Upon such conflicting evidence, the trial court found: " . . . said name of Hazel Edna Johnson was forged by Granville William Johnson . . . without knowledge to defendant New York Life Insurance Company; . . . that the policies of insurance . . . were prepared and signed . . . in the belief that said application for said policies was signed by the insured . . . that

said defendant New York Life Insurance Company relied on the statements contained in said application . . . ''

Since there is credible evidence to sustain the trial court's finding, it would not ordinarily be disturbed. It and other findings of a like tenor are sufficient, in the absence of other circumstances, to sustain the judgment that no policies were validly issued.

Upon the foregoing *résumé,* the findings of the trial court would be unquestionably decisive. Certain uncontradicted and uncontroverted facts, however, compel and impel us to view the matter from a different perspective and to reach a different conclusion.

The application for the policies in this case, as is true with most such applications, is in two parts, one of which is the proposal to take life insurance or the part which contains the disputed signature, and the other the medical examination of the deceased, which likewise called for the signature of the deceased. The medical portion of the application is signed by the insured, there being no controversy on this point. The policies recite, on their faces: ''The policy and application therefor, a copy of which is attached hereto, constitute the entire contract.'' As a matter of fact, as well as of law, it is apparent, therefore, that the whole application was necessary to constitute the contract. (*Westphall* v. *Metropolitan Life Ins. Co.,* 27 Cal. App. 734 [151 Pac. 159] ; *Paulhamus* v. *Security Life & Ann. Co.,* 163 Fed. 554; *Goodwin* v. *Provident Sav. Life Assur. Soc.,* 97 Iowa, 226 [66 N. W. 157, 59 Am. St. Rep. 411, 32 L. R. A. 473] ; *Morris* v. *State Mutual Life Assur. Co.,* 183 Pa. 563 [39 Atl. 52] ; *Keller* v. *Home Life Ins. Co.,* 95 Mo. App. 627 [69 S. W. 612] ; *Holden* v. *Metropolitan Life Ins. Co.,* 11 App. Div. 426 [42 N. Y. Supp. 310] ; *Dimick* v. *Metropolitan Life Ins. Co.,* 69 N. J. L. 384 [55 Atl. 291, 62 L. R. A. 774] ; *Ames* v. *Manhattan Life Ins. Co.,* 31 App. Div. 180 [52 N. Y. Supp. 759] [affirmed 167 N. Y. 584] ; *Weisguth* v. *Supreme Tribe of Ben Hur,* 272 Ill. 541 [112 N. E. 350].)

The trial court found as a fact that the deceased was ''examined by Doctor Richard C. McCloskey, a medical examiner of defendant New York Life Insurance Company, and on or about said date signed in her own handwriting the answers to medical examiner on the form provided by defendant New York Life Insurance Company and as set forth in

plaintiffs' Exhibit 4; . . . '' Starr persistently denied that he had had any contact with the deceased, although defendant asserted in his deposition that Starr had had at least two personal interviews with deceased with reference to the policies. Starr, however, admitted that at the time the application was made, respondent had in its employ an inspector, as distinguished from a medical examiner, when he turned in his request for medical examination; with reference to which phase of the matter Starr testified in part as follows: ''Q. Who, if anyone, other than Mr. Johnson, negotiated with you or had anything to do with the issuance of these policies? A. So far as I was concerned, only Mr. Johnson. Mrs. Johnson was examined by the doctor and also seen by our inspector. That was a conclusion that I would naturally draw. Q. It was a conclusion and not a statement of fact? A. The doctor I knew had made the medical examination, apparently because it had come in.'' Whether the inspector mentioned actually called upon and interviewed deceased does not appear.

The record shows without dispute that Dr. McCloskey, the medical examiner, examined the insured at her home, 4409 Turquoise Street in Los Angeles; that he identified his signature on the reverse side of the medical portion of the application and that the woman he examined signed her name, Hazel Edna Johnson, in his presence, and that when he arrived to make the examination, the person he examined was the only person in the house, and further that his usual routine on making such a visit was to announce that he was the examiner for the New York Life Insurance Company. He further testified without contradiction that all the handwriting on the medical portion of the application was his handwriting except for the signature of the deceased, and except for two notations; that he went to make the examination under instruction of the medical department of respondent, which department told him whom he was to see; that respondent told him he was to see Hazel Edna Johnson, and that he inquired for her by that name when he got there, and the woman he examined was the woman who said she was Hazel Edna Johnson and was the woman who signed the responses to his inquiries. In section 6, subdivisions a, b, c and d, of the medical portion of the application, the deceased answered ''No'' to the following questions: ''Have you now pending any other application for insurance on your life or for the reinstatement of

insurance? Have you ever been examined either on or in anticipation of an application for insurance without receiving such insurance? Have you ever been declined for life insurance or for the reinstatement of life insurance? Have you ever been offered a policy differing in plan or amount or in premium rate from that applied for?''

In the medical examiner's report with reference to the medical portion of the application the following appears: ''29. A. What is the name of the agent as given by the applicant? A. Starr. B. If known, state Branch Office agent is connected with. B. L. A.''

█ The foregoing *résumé* of the evidence with reference to the medical portion of the application being *undisputed,* it can hardly be urged that the deceased did not know that she had an application for life insurance pending, and that she did not know who the soliciting agent was.

If the deceased knew that she was applying for insurance and intended to do so in good faith, it would make no difference, so far as the validity of the application is concerned, whether the name signed to part one or the proposal portion of the application was her signature or not. Nor would it make any difference how foul or sinister the purpose of defendant was in persuading her to apply for insurance, assuming that he did persuade her, or that the defendant actually did have in mind at the time the application was made the brutal and infamous crime that he subsequently perpetrated. In fact, it would make no difference whether the insured signed the application at all, even though, as already pointed out, she did actually sign the medical portion of the application.

There is not a scintilla of evidence in the record impugning the good faith of deceased. Indeed, it would call for a deranged imagination to suppose that the deceased was a party to a plan for her own murder so that her husband might reap a financial profit. █ It is well established that the signature of an insured to an application is not necessary to predicate the issuance of a valid insurance policy, and this is so even though the policy inferentially requires the signature of the insured to the application, which the policies in question do not. (*Bloom* v. *Pacific Mutual Life Ins. Co.*, 85 Cal. App. 419 [259 Pac. 496]; *Kahn* v. *Royal Indemnity Co.*, 39 Cal. App. 180 [178 Pac. 331].) In the latter case, the

court says, at page 183: "It is admitted by the respondent that the circumstances under which the application was received are somewhat vague and uncertain, but it is true, as claimed, that it was never signed by the deceased. The policy further provides, however, that 'This policy with a copy of the application therefor *signed by the insured,* and such other papers as may be attached to or endorsed hereon, shall constitute the entire contract between the company and the insured. . . . ' As urged by the appellant, the policy gives no support, therefore, to the contention of counsel for respondent, for whether the application was signed by the insured or not, it is a paper attached to the policy, and therefore constitutes a part of the contract between the company and the insured, under the provisions of which the insured agreed to accept the policy subject to all the terms and conditions contained in the application. *And the fact that it was not signed is immaterial.*" (Italics ours.)

Furthermore, assuming the same premise, to wit: That the deceased intended to and was in good faith applying for insurance, defendant, her husband, was entirely competent to act as her agent. The evidence shows that he did in fact so act and was accepted as her agent by respondent. On this phase of the matter, the record shows without dispute that the two blank applications were handed to the defendant by Starr; that defendant subsequently returned them to Starr, one filled out in the penciled handwriting of his wife, and the other in blank containing her name signed in ink, which were accepted by the respondent's agent, who completed the application ultimately filed, using the penciled application to obtain the necessary information. Construing these facts in the light most favorable to respondent, the most that can be said is that defendant concocted a nefarious crime and as the first step towards its consummation, assumed to act as agent for the deceased to obtain insurance for her. The only evidence with reference to the handwriting of the penciled application is that it was the handwriting of the deceased. If this be true, there can be no question but that when defendant returned both applications to respondent's agent, he must have been requested to do so by deceased. Unfortunately, however, the penciled application has been lost or destroyed, and it may be that such penciled application was not in the handwriting of the deceased (since the only

evidence on that subject is that of defendant), and that the whole thereof was forged by defendant and returned to respondent's agent. Assuming all the foregoing, it is still impossible to conclude that any adult of normal mentality (and there is not a remote suggestion to the contrary here) could undergo a medical examination and answer the questions required, some of which have been alluded to, and not know what was going on. Since we must conclude that deceased did know that she was applying for a policy of insurance at the time of her medical examination, it follows that at least as of the date of said medical examination, at which time she signed the medical portion of the application, she ratified and adopted the acts of defendant as to part one of the application, thus approving the self-assumed agency of the defendant. (Civ. Code, secs. 2307, 2311; *Tosi* v. *Northern California Bldg. & Loan Assn.*, 3 Cal. (2d) 274 [44 Pac. (2d) 333].)

The court found that the medical examination by Dr. McCloskey was made on the sixteenth day of April, 1926. This finding is not supported by the evidence, since the medical portion of the application is not dated April 16, but April 9, 1926. The doctor's certificate which accompanied the medical portion of the application is also dated April 9th. An O. K. on the doctor's certificate, made by one Heaton, is dated April 13, 1926, and is stamped with the company's stamp as of April 12, 1926. Part one, or the proposal portion of the application, is dated April 12, 1926, this date being in the handwriting of the soliciting agent, Starr, and admittedly having been inserted by him. From these facts it may be concluded that the penciled application and the blank application containing the signature were delivered to Starr after the actual date of the medical examination, or that they were delivered to Starr some time prior to April 9th and dated April 12th, to wit: the day upon which the medical portion of the application with the doctor's certificate was actually received at the office, as manifested by respondent's stamp. Respondent, however, admits in its brief that the medical examination of deceased took place prior to the delivery of the application by defendant to Starr, the soliciting agent. If this be true, then it must be clear that defendant was authorized to act for deceased from the beginning,

and if he was, he clearly had a right to sign her name to the application. (*Bloom* v. *Pacific Mutual Life Ins. Co., supra.*)

■ The policies also contained a clause with reference to incontestability, as follows: "This policy shall be incontestable after two years from its date of issue except for non-payment of premium and except as to provisions and conditions relating to Double Indemnity." The complaint in this action was filed April 27, 1928, and the answer of the insurance company was filed June 21, 1928. Since the policies in question were dated and issued as of April 21, 1926, more than two years had elapsed before the insurance company set up any contest of these policies. It is settled that a contest of the insurer is too late if commenced after the expiration of the contestable period. (*Dibble* v. *Reliance Life Ins. Co.*, 170 Cal. 199 [149 Pac. 171, Ann. Cas. 1917E, 34]; *Tracy Loan & Trust Co.* v. *Mutual Life Ins. Co. of N. Y.*, 79 Utah, 33 [7 Pac. (2d) 279]; *Murray* v. *State Mutual Life Ins. Co.*, 22 R. I. 524 [48 Atl. 800, 53 L. R. A. 742]; *Patterson* v. *Natural Premium Mut. Life Ins. Co.*, 100 Wis. 118 [75 N. W. 980, 69 Am. St. Rep. 899, 42 L. R. A. 253]; *Clement* v. *New York Life Ins. Co.*, 101 Tenn. 22 [46 S. W. 561, 70 Am. St. Rep. 650, 42 L. R. A. 247]; *Kline* v. *National Ben. Assn.*, 11 Ind. 462 [11 N. E. 620, 60 Am. St. Rep. 703]; *Mareck* v. *Mutual Reserve Fund Life Assn.*, 62 Minn. 39 [64 N. W. 68, 54 Am. St. Rep. 613]; *Metropolitan Life Ins. Co.* v. *Peeler*, 71 Okl. 238 [176 Pac. 939, 6 A. L. R. 441].)

■ It is true that in the instant case the answer sets up an attempted rescission as of July 26, 1926, on which date respondent sent a letter to defendant, the nominal beneficiary in the policy, and inclosed a check in his favor for the amount of the premium, which had been paid in cash, which check was received and cashed by defendant. Prior to July 26, 1926, defendant Johnson had already been convicted of the murder of his wife, and his motion for a new trial denied. He was at that time incarcerated in the county jail at Flagstaff, Arizona. In fact, the letter of respondent is addressed to defendant at that place. It has already been determined by this court, in *Meyer* v. *Johnson*, 115 Cal. App. 646 [2 Pac. (2d) 456], that defendant, the beneficiary named in the policies, is not entitled to take anything thereunder. Under such circumstances, no rescission or cancellation of the policies involved could be concluded by the acts of defendant, since de-

fendant, in spite of the fact that he was named beneficiary in the policies, did not have at the time of the alleged rescission, as a matter of law, any interest therein. (*Meyer* v. *Johnson, supra.*) It is not disputed, in fact, the record affirmatively shows, that respondent had actual notice of all the facts, which precluded defendant from having an interest in the policies. As will appear with more particularity hereafter, the premium was paid partially in cash and the balance by note. The letter of cancellation addressed to defendant said in part: ''The company has been further advised that such proposed insurance was being obtained solely at your insistence and all negotiations therefor were conducted by you, and that you have recently been convicted of the murder of said Hazel Edna Johnson.'' This admission in the letter, together with the fact that, as early as May 4th, respondent had withheld transmittal of the reissued policies, leaves nothing to the imagination so far as respondent's knowledge of the facts is concerned.

The same letter of cancellation said, with reference to the note: ''Mr. Starr the soliciting agent holds a promissory note for $66.12 bearing date April 28, 1926, purporting to be signed by Hazel Edna Johnson, and to be given in connection with said policies, but the company has been advised by Mr. Starr that he himself filled out said note and signed the name of said Hazel Edna Johnson thereto and said note is being canceled as void and of no effect.'' The letter is signed by an officer of respondent. It is not signed by Starr, nor has Starr offered to return or actually returned the note. Respondent, so far as the record shows, had no authority to cancel Starr's note. The alleged cancellation or rescission is itself ineffectual, assuming that a notice of rescission or cancellation with a return of cash premium could be made with defendant. The facts with reference to an actual consummation of a cancellation or rescission are important, since it has been questioned even as between proper parties whether a notice of cancellation or rescission would actually effect a cancellation or rescission of a policy unless the facts and circumstances show a clear and unambiguous rescission. In the absence of a clear and unambiguous rescission, it has been held that *when a policy contains an incontestable clause* the insurer must take *legal action* to cancel such a policy within the prescribed period in order to effect a rescission or

cancellation. (*Tracy Loan & Trust Co.* v. *Mutual Life Ins. Co. of New York, supra; American Trust Co.* v. *Life Insurance Co. of Virginia,* 173 N. C. 558 [92 S. E. 706] ; *Thistle* v. *Equitable Life Assur. Soc.,* 149 Tenn. 667 [261 S. W. 667] ; *Reliance Life Ins. Co.* v. *Thayer,* 84 Okl. 238 [203 Pac. 190] ; *Mutual Life Ins. Co. of N. Y.* v. *Buford,* 61 Okl. 158 [160 Pac. 928] ; *Killian* v. *Metropolitan Life Ins. Co.,* 251 N. Y. 44 [166 N. E. 798, 64 A. L. R. 956].) In the Tracy case, *supra,* the court says, pages 280–281 [7 Pac. (2d)] :

''The decisions are not unanimous as to how a contest under an incontestable cause may be begun. Some courts hold that a mere letter or notice of rescission with offer to refund premiums paid is a sufficient act of contest. (*Mutual Life Insurance Co.* v. *Hurni Packing Co.,* (C. C. A.) 280 Fed. 18; *Great Southern Life Insurance Co.* v. *Russ,* (C. C. A.) 14 Fed. (2d) 27.) But the great weight of authority is that a mere letter of rescission is not a contest even *if accompanied by an offer to return premiums paid,* but that the insurer must make its contest in the courts, and that such a contest is nothing short of a proceeding where the parties are actually at grips with issues joined involving the invalidity of the policy. The cases hold 'a contest begins when the contestants, satisfied no longer with minatory gestures, are at grips with each other in the arena of the fight. When the fight is a civil controversy, the arena is the court.' (*Killian* v. *Metropolitan Life Insurance Co., supra.*) 'A contest so provided for imports litigation, the invoking of judicial action to cancel or prevent the enforcement of the policy, either by a suit to that end or by a defense to an action on the policy.' (*Northwestern Mutual Life Insurance Co.* v. *Pickering,* (C. C. A.) 293 Fed. 496, 499, *certiorari* denied, 263 U. S. 720 [44 Sup. Ct. 229, 68 L. Ed. 524].) 'In order to contest the policy it (the insurer) was required to file an answer to the suit brought by the beneficiary within one year, or to have instituted an action of its own in equity to cancel the policy on the ground of fraud.' (*Missouri State Life Ins. Co.* v. *Cranford,* 161 Ark. 602 [257 S. W 66, 69, 31 A. L. R. 93].) Other cases supporting this rule are cited in 37 C. J. 540, and in the recent decisions of *Killian* v. *Metropolitan Life Insurance Co., supra, New York Life Insurance Co.* v. *Hurt,* (C. C. A.) 35 Fed. (2d) 92, *Rose* v. *Mutual Life Ins. Co.,* (C. C. A.) 19 Fed. (2d) 280, and *Powell* v. *Mutual Life*

*Insurance Co. of New York,* 313 Ill. 161 [144 N. E. 825, 36 A. L. R. 1239 and note]. It follows that the filing of an answer or counterclaim such as was filed in the federal court would be sufficient if the filing in that court is to be given the same effect as would follow had it been filed in the state court without removal, or had there been no remand to the state court from the federal court.''

▮ Respondent admits that the law as stated with reference to incontestability is sound, but contends that here there was no reason to contest because *no* policies were *ever validly issued.* If this contention of respondent is sound, is it not equally tenable to say that it was a useless act for respondent to even attempt, as it did, to effect a cancellation by letter? If the policies, as respondent contends, did not legally exist, there was no more need for an attempted cancellation or rescission by letter than there would be by legal action.

Other questions have been raised with reference to the actual issuance or delivery of the policies in question and the payment of premium therefor. With reference to these questions, it appears that the application originally was for one life insurance policy of $2,500, which called for payment of premium annually. The soliciting agent, Starr, requested the company to issue and forward two several life insurance policies in that amount, which were issued on April 21, 1926. When the policies arrived on April 28, Starr took the original policy, as ordered, together with the additional $2,500 policy which had been issued, and showed the two policies to the defendant. He testified that he saw defendant at the home of defendant and deceased, but that Mrs. Johnson was not in the house. It appears that defendant told Starr they would take both, if Starr would arrange to have the premiums paid semi-annually instead of annually. Starr testified that he handed the policies to defendant, that he and defendant both looked them over, but that he did not leave the policies with defendant, but took them away with him for the purpose of obtaining the endorsement to effect the change in method of payment of premium as desired. He further testified that defendant made a cash payment, which was approximately one-half of the premium on both policies; that he returned to the office with the policies, made out a note for the full amount of the balance of the premium to himself and signed the note, Hazel Edna Johnson, transmitting both the note and

the cash to the home office of respondent, together with an application for a change in the policies providing for payment of premium semiannually instead of annually. The application for the change was also signed by Starr, who admits saying nothing about the necessity of having such application signed by the insured, either to defendant or to the insured. The policies with the requested change were reissued at the home office of respondent on May 4, 1926, but before the reissued policies were actually forwarded for delivery, the respondent received information that the defendant had killed the insured on May 2, 1926. Accordingly, the reissued policies were never delivered to the insured or to the beneficiary, or to anyone on behalf of the insured. On similar facts the cases hold that there has been both payment and delivery. (Civ. Code, sec. 2598; *Bloom* v. *Pacific Mutual Life Ins. Co., supra; Vierra* v. *New York Life Ins. Co.,* 119 Cal. App. 352, 360, 361 [6 Pac. (2d) 349]; *Masson* v. *New England Mut. Life Ins. Co.,* 85 Cal. App. 633, 639 [260 Pac. 367]; *Kansas City Life Ins. Co.* v. *Hislip,* 154 Okl. 42 [6 Pac. (2d) 678]; *Farnum* v. *Phoenix Ins. Co.,* 83 Cal. 246 [23 Pac. 869, 17 Am. St. Rep. 233]; *Palmer* v. *Continental Ins. Co.,* 132 Cal. 68 [64 Pac. 97].)

There is little in the record in addition to what has been recounted with reference to the facts surrounding the second policy. It is clear, however, that the second policy as well as the first was issued on the strength of the application for the first, which is the only application. There is no evidence in the record other than that already detailed which sheds any light upon the scope of defendant's agency, respondent contending, as we have already recorded, that defendant was not the agent of the insured at all. Since we have held that he was her agent for the purpose of making the application for the original policy and since the second policy was issued on the strength of the application for the first, the second policy, in our view of the matter, *was regularly issued.*

The cases are legion to the effect that fraud will not be presumed and that proof thereof must be clear, convincing and unequivocal. In this case the two facts suggesting fraud were, first, that the name signed to part I of the application was not in the handwriting of deceased, and the fact that defendant killed his wife within a few days after the

receipt of the policies. The first fact shows no fraud and the second, assuming that defendant had in mind the murder which he subsequently committed, at the time the second policy was accepted, which is proved only by the fact that the murder was actually committed, cannot be charged to the insured. ▮ Such fraud, assuming that it could be proved, would not interfere with the validity of the issuance of the policy, but would, if successfully proved, have the effect of avoiding a policy validly issued. Respondent, by the terms of its own contract, limited itself to two years to establish the alleged fraud and, having failed to do so within that time, it is now precluded from asserting it. Mr. Justice Story, in the case of *Carpenter* v. *Providence Washington Ins Co.*, 16 Pet. 495, 509 [10 L. Ed. 1044, at 1050, 1051], said:

"It is not true that because a policy is procured by misrepresentation of material facts it is therefore to be treated, in the sense of the law, as utterly void *ab initio*. It is merely voidable, and may be avoided by the underwriters upon due proof of the facts; but until so avoided it must be treated for all practical purposes as a subsisting policy. In this very case the policy has never, to this very day, been avoided, or surrendered to the company. It is still held by the assured, and he may, if he pleases, bring an action thereon tomorrow; and unless the underwriters should at the trial prove the misrepresentation, he will be entitled to recover . . . Indeed, we are not prepared to say that the court might not have gone farther, and have held that a policy—existing and in the hands of the insured, and not utterly void upon its very face, without any reference whatever to any extrinsic facts—should have been notified to the underwriters; even although by proofs, afforded by such extrinsic facts, it might be held in its very origin and concoction a nullity."

The judgment is reversed, and since the conclusions we have reached are based upon undisputed evidence, the trial court is directed to modify and alter its findings in accordance with the views herein expressed, and to enter judgment for appellants for the full amount of said policies plus interest thereon.

Houser, Acting P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 10, 1935, and an application by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 12, 1935.